David **STACEY** and Sharon Stacey, husband and wife, and Destec, Inc., A Missouri Corporation, Plaintiffs–Appellants,

v.

Steve **REDFORD**, an individual, Bob Reasoner, an individual d/b/a BMR, LLC, and BMR Investments, LLC, A Missouri Limited Liability Company, Defendants–Respondents.

No. 27468.

Missouri Court of Appeals,
Southern District,
Division Two.

June 26, 2007.

JEFFREY W. BATES, Chief Judge.

In January 2004, David Stacey (Stacey) and BMR Investments, LLC (BMR), entered into a property management agreement. In July 2004, BMR terminated the agreement pursuant to a default provision because Stacey had been delinquent in remitting payments to BMR's escrow agent more than three times in twelve months. Thereafter, Stacey filed a lawsuit against BMR for breach of contract and tortious interference with a business relationship. After the filing of cross-motions for summary judgment, the trial court entered a judgment in favor of BMR upholding the termination of the management agreement. Stacey appealed. We affirm.

## I. Standard of Review

We review the propriety of the trial court's grant of summary judgment in BMR's favor based on the record submitted below. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993); *Bumm v. Olde Ivy Development, LLC*, 142 S.W.3d 895, 896–97 (Mo.App. 2004). The material facts presented for the trial court's consideration in the competing motions for summary judgment were undisputed, and both Stacey and BMR agree this appeal presents an issue of law for our determination. We utilize a *de novo* standard of review and accord no deference to the decision below. *Poage v. State Farm Fire & Cas. Co.*, 203 S.W.3d 781, 783 (Mo.App.2006); *Bland v. IMCO Recycling, Inc.*, 122 S.W.3d 98, 102 (Mo. App.2003). Therefore, our job is to decide afresh whether BMR has established an undisputed right to judgment as a matter of law. Rule 74.04(c)(6); *ITT*, 854 S.W.2d at 380.[1]

Larry G. Luna, Forsyth, MO, for Appellants.

Bryan O. Wade, Ginger K. Gooch, Springfield, MO, for Respondents.

---

1. All references to rules are to the Missouri Court Rules (2007).

## II.  Facts and Procedural History

This lawsuit arose out of a transaction to sell a two-acre tract of land on Highway 76 in Branson, Missouri, known as Stacey's Ozark Village (Ozark Village).  The property contained a motel and commercial retail tenants.  Ozark Village was operated by Destec, Inc. (Destec).  Stacey was the President of Destec.  His wife, Sharon Stacey (Sharon), was the corporation's secretary.[2]  As of December 2002, Destec owed at least $700,000 to Ozark Mountain Bank (OMB).  Destec had pledged Ozark Village stock as collateral for the loan.  Destec was delinquent on its payments, so it borrowed another $200,000 and again pledged Ozark Village stock as collateral.  Approximately $80,000 of this second loan was paid to OMB. The remainder was used to pay delinquent property and payroll withholding tax obligations.  Stacey had personally guaranteed the loan obligations.  Destec eventually defaulted on the $200,000 loan.

On January 24, 2004, Destec sold Ozark Village to BMR for $1,000,000.  Destec used the proceeds to fully pay off both of its loans.  Contemporaneously with the sale, various parties entered into three agreements that are relevant to this appeal.  These are: (1) a management agreement and option contract between Stacey and BMR (hereinafter, the Management Agreement); (2) an "Acknowledgement of Termination of Management Agreement and Option" agreement (the Acknowledgment) signed by Stacey in conjunction with his execution of the Management Agreement; and (3) an escrow agreement involving Stacey, BMR and escrow agent Steven Hays (Hays).  Each agreement is described more fully below.

Stacey and BMR were the only parties to the Management Agreement, which was executed by BMR representative Bob Reasoner (Reasoner) and Stacey on January 23, 2004.  In this agreement, Stacey was designated as "Manager," and BMR was designated as "Owner."  Articles I and III provided that Stacey was appointed to act as BMR's agent in managing Ozark Village.  His duties included operating the motel and collecting rents from the tenants.  Stacey also agreed to obtain and maintain at his expense "all licenses and permits enabling Manager to operate the property."[3]  Article IX addressed defaults.  In pertinent part, it stated that "[i]n the event Manager is delinquent in monthly payments under this Agreement more than three (3) times during any twelve (12) month period, such default will constitute a separate default under this Agreement that cannot be cured and [Hays] is hereby directed under such circumstances to deliver the executed [Acknowledgement] to Owner for recording with the Taney County Recorder's Office."  Article X provided that BMR was entitled to receive a net monthly payment of $12,325.  This payment was to be made on or before the 15th day of each month commencing in March 2004.  Stacey was required to remit payment to Hays for BMR's benefit.  After payment of expenses, Stacey was entitled to keep all remaining proceeds from his operation of Ozark Village as a management fee.  Article XI gave Stacey an option to repurchase Ozark Village within five years, so long as the option was exercised prior to termination of the Management Agreement.

**2.**  Because the Staceys' surname is the same, we will refer to Sharon by her given name when referring to her individually.  We do so for purposes of clarity and intend no disrespect.

**3.**  It is undisputed that Stacey is not licensed in Missouri as a real estate broker.

On the same day the Management Agreement was executed, Stacey also signed the Acknowledgement. In pertinent part, this document stated that the Management Agreement would terminate as of the date the Acknowledgement was recorded in Taney County.

In the escrow agreement, Hays was appointed to be the escrow agent for Stacey and BMR. Hays agreed to hold the Acknowledgement and only deliver it in accordance with the terms of Article IX of the Management Agreement.

It is undisputed that the first four payments required by Article X of the Management Agreement were delinquent. Stacey made the March 15th payment on April 28, 2004. He made the April 15th payment on May 28, 2004. He made the May 15th payment on June 28, 2004. The June 15th payment was never made. It also is undisputed that BMR did not send Stacey a written notice of default with respect to any of the delinquent payments.

On July 1, 2004, Hays gave notice to BMR that he would be filing the Acknowledgement because Stacey had been delinquent on his payments more than three times in a twelve-month period. On July 2, BMR representative Steve Redford (Redford) verbally notified Stacey that the Management Agreement was being terminated for that reason. Hays recorded the Acknowledgement at the Taney County Recorder of Deeds on July 15, 2004.

The next day, the Staceys and Destec filed suit against BMR, Redford and Reasoner for breach of contract and tortious interference with a business relationship. Thereafter, BMR, Redford and Reasoner filed a motion for summary judgment. The Staceys and Destec also filed their own motion for summary judgment. The trial court heard arguments on the competing motions in October 2005.

On December 6, 2005, the trial court entered summary judgment in favor of all defendants.[4] BMR was granted summary judgment on Stacey's claim for two reasons: (1) the accumulation of more than three delinquent payments during a twelve-month period was an incurable default according to the express terms of the Management Agreement; and (2) in any event, this agreement was unenforceable because Stacey was not a real estate broker, and it was unlawful for him to perform his obligations without a real estate license. This appeal followed.

### III. Discussion and Decision

Stacey presents two points for decision. For ease of analysis, we will address the points in reverse order.

#### Point II

In Stacey's second point, he contends the trial court erred in granting summary judgment because the decision was based upon a misinterpretation of the Management Agreement. "The interpretation of a contract is a question of law." *Dean Machinery Co. v. Union Bank,* 106 S.W.3d 510, 520 (Mo.App.2003). "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn*

---

4. The trial court determined that all defendants were entitled to judgment as a matter of law on the claims of Sharon and Destec because Stacey and BMR were the only real parties in interest with respect to the Management Agreement. Similarly, Redford and Reasoner were granted judgment as a matter of law because they were not parties to the Management Agreement and acted only in their capacities as BMR representatives. Further discussion of these rulings is unnecessary because Sharon and Destec did not appeal, and Stacey abandoned these issues by not raising them in his brief. *See Ray v. Wisdom,* 166 S.W.3d 592, 598 n. 4 (Mo.App.2005).

*Indus. Group, Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 428 (Mo. banc 2003); *Rathbun v. CATO Corp.,* 93 S.W.3d 771, 778 (Mo.App.2002). To determine the intent of the parties, the terms of a contract are read as a whole and given their plain, ordinary, and usual meaning. *State ex rel. Vincent v. Schneider,* 194 S.W.3d 853, 859 (Mo. banc 2006); *Dunn,* 112 S.W.3d at 428. Each term is construed to avoid an effect that renders other terms meaningless. *Dunn,* 112 S.W.3d at 428. "A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Id.; Creviston v. Aspen Products, Inc.,* 168 S.W.3d 700, 704 (Mo.App.2005).

■ We begin by examining the terms of Article IX. The first paragraph states, in pertinent part, that "[i]f Manager should fail to perform under this Agreement ... including the failure to pay the fee set forth in Article X hereof, the license and permission given to Manager to collect rents and manage the Property as herein provided shall immediately cease and terminate." The second paragraph then states:

> In order to confirm that Manager has complied with his Article X payment obligations, Manager shall pay the monthly fee set forth in the succeeding Article X to [Hays]. Manager shall execute [the Acknowledgement] in the form attached hereto as Exhibit "A" the original of which shall be held by [Hays], in accordance with an Escrow Agreement to be separately executed by Owner, Manager and [Hays]. In the event that any payment as set forth in the succeeding Article is delinquent, Owner shall give Manager written notice of such default and Manager shall have ten (10) days to cure such default. In the event [Hays] does not receive said payment within the ten (10) day cure period, this Agreement shall terminate as set forth above (including the Option as set forth in Article XI) and [Hays] is hereby directed to deliver the executed [Acknowledgment] to Owner for recording with the Taney County Recorder's Office. *In the event Manager is delinquent in monthly payments under this Agreement more than three (3) times during any twelve (12) month period, such default will constitute a separate default under this Agreement that cannot be cured and [Hays] is hereby directed under such circumstances to deliver the executed [Acknowledgement] to Owner for recording with the Taney County Recorder's Office.*

(Italics added.)[5] The trial court relied upon the italicized language in granting summary judgment to BMR. Stacey argues that the trial court misinterpreted the Management Agreement because Article IX required BMR to give Stacey three written notices of delinquency before BMR could terminate the agreement. We disagree.

It is undisputed that Destec and Stacey had a significant prior history of delinquent payments and had even defaulted on one loan while operating Ozark Village. The second paragraph of Article IX was included in the Management Agreement to

---

**5.** Article IX also contained one more paragraph dealing with matters other than delinquent payments. It stated: "In the event of any other default, Owner shall give Manager written notice of such default and Manager shall have ten (10) days to cure such default. In the event Manager fails to cure such default, this Agreement shall terminate as set forth above (including the Option as set forth in Article XI) and [Hays] is hereby directed to deliver the executed [Acknowledgement] to Owner for recording with the Taney County Recorder's Office."

specifically address defaults resulting from delinquent payments. In the sense used in Article IX, the plain and ordinary meaning of the word, "delinquent," is "2: being overdue in payment <a ⁻charge account>." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed.2005). Article IX identified two separate default events triggered by late payments: (1) a single late payment; and (2) more than three late payments within a twelve-month time span. The first default event could be cured; the second default event could not. Thus, they were independent grounds for termination of the Management Agreement.

Reading these terms together so as to give each a reasonable meaning, Article IX plainly distinguished between a single, curable late payment and an unacceptable pattern of late payments that would lead to automatic termination of the Management Agreement. A single late payment could lead to termination, but only if BMR gave Stacey written notice and ten days to cure the default. The purpose of the written notice requirement was to give Stacey ten days after receiving the notice to cure the default. He and BMR specifically agreed, however, that a pattern of more than three late payments within twelve months was "a separate default under this Agreement that cannot be cured...." If that happened, Hays had already been directed by Stacey and BMR to file the Acknowledgement, which would result in automatic termination of the Management Agreement.

Upon review of the undisputed facts in the record, we conclude that BMR was entitled to judgment as a matter of law. By the express terms of the Management Agreement, Stacey knew that he was obligated to pay BMR's monthly fee on or before the 15th of each month, commencing in March 2004. Stacey had personal knowledge of when each fee payment was made. Therefore, he already knew that his March, April, May and June 2004 payments were delinquent. BMR's failure to give written notice did not change the fact that none of these payments had been made on time. Finally, Article IX clearly and unequivocally stated that the Management Agreement would be terminated automatically if Stacey were delinquent in his monthly payments four times in twelve months. On these facts, Stacey's contention that he was entitled to written notice prior to termination rings hollow.[6] Written notice would have served no purpose because Stacey's default was incurable. The law does not require written notice to be given when doing so would be a vain and useless act. *See, e.g., Home Trust Co. v. Josephson,* 339 Mo. 170, 95 S.W.2d 1148, 1152 (1936); *Darr v. Structural Systems, Inc.,* 747 S.W.2d 690, 694 (Mo.App.1988). The application of this general principle of Missouri law is in accord with appellate decisions from other jurisdictions more specifically holding that the failure to give written notice, pursuant to a notice-and-cure provision in a contract, does not prevent immediate termination of the agree-

---

**6.** According to Stacey, the notice requirement was logically designed to provide a warning to him, "three strikes and you're out." If "he had been given three delinquent *notices* and chosen not to cure within a twelve-month period, then he would have no complaint...." Contrary to Stacey's argument, the applicable default provision requires automatic termination based upon "delinquent ... monthly payments." We must give this phrase its "plain, ordinary, and usual meaning." *Dunn Indus. Group, Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 428 (Mo. banc 2003); *State ex rel. Vincent v. Schneider,* 194 S.W.3d 853, 859 (Mo. banc 2006). Since this provision is triggered by delinquent payments alone, notice is not an issue. Reading this default provision should have given Stacey all the warning he needed concerning the consequences of multiple delinquent payments.

ment if the breach is incurable. *See, e.g., L.K. Comstock & Co., Inc. v. United Engineers & Constructors Inc.,* 880 F.2d 219, 232 (9th Cir.1989) (the notice provision is based on the assumption that the breach which would be used to terminate the contract is curable; notice is not required where doing so would have been a useless gesture); *In re Best Film and Video Corp.,* 46 B.R. 861, 875 (Bankr.E.D.N.Y. 1985) (notice provision assumes the breach which could result in termination is curable); *Leghorn v. Wieland,* 289 So.2d 745, 748 (Fla.App.1974) (if the breach was so grave as to be incurable, giving notice would be a useless gesture); *Larken, Inc. v. Larken Iowa City Limited Partnership,* 589 N.W.2d 700, 703–05 (Iowa banc 1998) (a hotel owner had the right to immediately terminate a management agreement because of the manager's self-dealing, despite a notice-and-cure provision in the contract); *Carlson Real Estate Co. v. Soltan,* 549 N.W.2d 376, 381 (Minn.App.1996) (a notice-and-cure provision is inapplicable to a default that is not susceptible to cure); *LJL Transp., Inc. v. Pilot Air Freight Corp.,* 905 A.2d 991, 992 (Pa.Super.Ct.2006) (a 90–day cure provision was inapplicable to an admitted breach of agreement which was impossible to cure).

In conclusion, the express terms of Article IX provided that more than three delinquent payments within a twelve-month period would constitute a separate event of default by Stacey that could not be cured. The Management Agreement was terminated after his fourth delinquency in twelve months. BMR was not required to give Stacey written notice prior to termination because doing so would have been a vain and useless act. Accordingly, the trial court did not err in granting summary judgment for BMR. Stacey's second point is denied.

*Point I*

In Stacey's first point, he contends the trial court erred in granting summary judgment because Stacey was not required to have a real estate license in order to perform his obligations under the Management Agreement. The trial court relied upon this ground as an alternative basis for granting summary judgment to BMR. In light of our disposition of Point II, Stacey's first point is moot and need not be addressed.

The judgment is affirmed.

GARRISON and BARNEY, JJ. Concur.